## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **HILDI GOLDSTEIN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | No. |
| | ) | |
| **GOLAN'S MOVING & STORAGE, INC.;** | ) | |
| **GOLAN'S MOVING & STORAGE, INC.** | ) | |
| **401(k) PROFIT SHARING PLAN; and** | ) | |
| **JULIE GOLD,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

NOW COMES the Plaintiff, Hildi Goldstein ("Ms. Goldstein"), by and through her attorneys, Peter M. Katsaros and Gillian G. Lindsay of Golan Christie Taglia LLP, and hereby files the instant Complaint against Defendants, Golan's Moving & Storage, Inc. 401(k) Profit Sharing Plan ("Plan"), Golan's Moving & Storage, Inc. ("GMS" or "Plan Administrator"), and Julie Gold ("Ms. Gold"), and states as follows:

## NATURE OF THE CASE

1. After finalizing an expensive and disruptive divorce, a Cook County Domestic Relations Judge awarded Ms. Goldstein fifty percent (50%) of the marital portion of her ex-husband's 401(k). The QDRO[1] is self-executing—it requires a lump-sum transfer to Ms. Goldstein as soon as practicable after the Plan Administrator approves the QDRO. Ms. Goldstein submitted the QDRO and all necessary documentation to Ms. Gold, who acted on behalf of the Plan Administrator and served as Trustee of the Plan.

---

[1] Capitalized terms are used as defined herein.

2. Ms. Gold and GMS failed to perform their duties with the standard of care required of Plan Administrators and breached their fiduciary obligations. It took nearly nine (9) months for Ms. Gold to process the transfer of Ms. Goldstein's benefits. During that time, the 401(k)'s value decreased by nearly twenty-five percent (25%)—in part due to Ms. Gold's erroneous and unauthorized liquidation of the entire account. Ms. Goldstein made a claim for the full value of her benefits. She exhausted the Plan's claim and appeal procedures, but was denied.

3. Adding insult to injury, Ms. Gold failed and refused to provide an ERISA-mandated summary plan description ("SPD") within thirty (30) days of Ms. Goldstein's oral and written requests. In violation of the Plan Administrator's duties under Section 104(b) of ERISA, Ms. Gold abdicated her obligations and insensitively directed Ms. Goldstein to obtain a copy from her ex-husband. Ms. Gold never provided Ms. Goldstein with a copy of the SPD.

4. Accordingly, Ms. Goldstein brings this action to recover the improperly denied benefits, statutory interest, attorneys' fees, ERISA penalties of $110.00 for each day of delinquency, and any other relief this Honorable Court deems just and appropriate.

**PARTIES**

5. Plaintiff Hildi Goldstein is an individual residing in this judicial district.

6. Upon information and belief, Defendant Golan's Moving & Storage, Inc. is a moving company and relocation service provider. GMS's address is 3600 Jarvis Avenue, Skokie, Illinois 60076. GMS serves as the Plan Administrator for Golan's Moving & Storage, Inc. 401(k) Profit Sharing Plan.

7. Upon information and belief, Defendant Golan's Moving & Storage, Inc. 401(k) Profit Sharing Plan is a 401(k) plan by which employees of GMS may make pre-tax contributions to their individual 401(k) accounts with an additional profit-sharing option by

which the Plan accepts discretionary employer contributions on behalf of the employee. The Plan is administered in this judicial district.

8. Defendant Julie Gold is the General Manager of GMS. Ms. Gold acts on behalf of the Plan Administrator and serves as Trustee of the Plan.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this action under Sections 502(a)(1)-(3)(e) of the Employee Retirement Income Security Act of 1974 as amended ("ERISA"), 29 U.S.C. § 1132(a), and 28 U.S.C. § 1331.

10. Venue is proper in this district pursuant to 28 U.S.C. § 1391, because all of the acts and omissions giving rise to this action occurred in the Northern District of Illinois. 28 U.S.C. § 1391(b).

11. Venue is also proper in the Northern District of Illinois, Eastern Division because Defendant does business and has employees located within this judicial district.

12. Ms. Goldstein has exhausted the Plan's administrative claim and appeal procedures.

## FACTUAL ALLEGATIONS

13. On or around March 3, 2015, Associate Judge Katz of the Circuit Court of Cook County, Illinois, Domestic Relations Division entered a Judgment For Dissolution of Marriage (the "Dissolution Order"), dissolving the marriage of Hildi Dvora (n/k/a Hildi Goldstein) and Yakov Dvora.

14. In the Dissolution Order, Judge Katz acknowledged that Yakov Dvora had an interest in a 401(k) held by John Hancock through his employment with GMS, with a balance of $185,142.05 as of December 31, 2014 (the "401(k)").

3

15.     The entire 401(k) account balance was earned during the marriage and was deemed marital property.

16.     Judge Katz ordered that Ms. Goldstein shall receive fifty percent (50%) of the 401(k) pursuant to a Qualified Domestic Relations Orders ("QDRO") entered by the Circuit Court of Cook County and prepared by WFA Econometrics Corporation ("WFA"), with the parties sharing the cost equally.

17.     On June 12, 2015, Judge Katz entered the QDRO.

18.     Judge Katz entered the QDRO pursuant to the Internal Revenue Code ("IRC") §414(p) and §206(d)(3)(B) of ERISA, as it relates to Yakov Dvora's, a Plan participant (the "Participant"), provision of child support, alimony payments or marital property right to the Participant's former spouse (Ms. Goldstein) in accordance with the State of Illinois domestic relations law. A true and correct copy of the QDRO is attached hereto as **Exhibit A**.

19.     According to the QDRO, Ms. Goldstein was assigned fifty percent (50%) of all account balances in the Plan with respect to the Participant as of March 3, 2015. *Id*.

20.     The Participant's balance was defined as the account balance, net of any loans that may have been outstanding as of March 3, 2015. *Id*.

21.     The QDRO provides that Ms. Goldstein:

> shall receive her portion of the Participant's account balance . . . in a single lump sum payment after this Order has been accepted by the Plan Administrator as a QDRO. . . . The lump sum payment to [Ms. Goldstein] may be made as soon as practicable after this Order has been approved as a QDRO. The lump sum amount stated in Article 3 above shall be adjusted for any market value and/or investment gains or losses from March 3, 2015 to the date of valuation for distribution to [Ms. Goldstein].

> . . . this Order must be promptly served upon the Plan Administrator, who shall within a reasonable period after receipt of this Order, determine whether this Order is a QDRO and notify Participant and each Alternate Payee of such determination.

Ex. A at §§ 4-5, 7.

22. The duty to implement the lump sum payment per the QDRO fell to the Plan Administrator.

23. Ms. Gold acted on behalf of the Plan Administrator and served as Trustee of the Plan.

24. On or around June 17, 2015, Ms. Goldstein submitted the QDRO and Supplemental Data Request Form (the "Form") to Ms. Gold. A true and correct copy of the June 17, 2015 transmittal letter is attached hereto as **Exhibit B**.

25. The Plan Administrator failed to discharge its QDRO duties under the Plan, ERISA, and the QDRO.

26. For example, the Plan Administrator failed to:

   a. Act promptly and in compliance with the Plan's QDRO procedures;

   b. Notify the participant and each alternative payee of the receipt of a domestic relations order;

   c. Determine whether the domestic relations order is a QDRO within a reasonable time following receipt and to notify the parties of such determination;

   d. Provide alternate payees with notice of the Plan's QDRO procedures "promptly upon receipt by the plan of the domestic relations order;" and

   e. Account separately for amounts payable to an alternative payee and to pay such segregated amounts including any interest therein to the alternate payee when the QDRO determination is made.

27. On or around July 16, 2015, Ms. Gold forwarded the QDRO and transfer information to John Hancock to calculate and divide the shares of the 401(k).

5

28. On June 30, 2015, the 401(k) aggregate account balance was $201,223.32.

29. This aggregate account balance did not fluctuate materially during the summer of 2015.

30. Once loan payments and post-March 3, 2015 contributions were subtracted from the 401(k) aggregate balance, the net balance was $197,369.69.

31. Ms. Goldstein's share of the 401(k) net balance as of June 30, 2015 was $98,698.35.

32. GMS and Ms. Gold delayed the distribution and created confusions regarding a simple fifty percent (50%) lump sum payment.

33. Ms. Goldstein made numerous requests for the distribution pursuant to the terms of the QDRO.

34. Ms. Goldstein also complied with each of Ms. Gold's requests to modify and revise a superfluous Form.

35. Regardless of whether Ms. Goldstein's Form was correct, the QDRO governs Ms. Goldstein's rights to the 401(k).

36. Indeed, the QDRO, the terms of which were never contested, is self-executing in that it does not include a provision requiring Ms. Goldstein to make a distribution election; instead, the express terms of the QDRO provides for a lump sum distribution as soon as practicable after the Order has been approved. *See* Ex. A.

37. In or around September 2015, Ms. Goldstein's domestic relations attorney concluded that the person in charge of the Plan (Ms. Gold) had never done this before so it is taking her longer than normal and causing the delay.

38. In addition to being inexperienced, Ms. Gold abdicated her responsibilities on

behalf of the Plan Administrator and as Trustee of the Plan, by passing them off to other service providers, *e.g.*, WFA.

39. Ms. Gold's conduct falls far short of the standard of conduct required of a Plan Administrator.

40. On or around September 30, 2015, the Plan Administrator erroneously distributed the entire 401(k) account balance to Ms. Goldstein.

41. Ms. Goldstein, her attorney, her IRA, and John Hancock cooperated to promptly returned the entire account balance to the 401(k) account on or around October 6, 2015.

42. The Plan Administrator's erroneous transfer resulted in investment losses to the 401(k) account of approximately $8,000.00.

43. Rather than promptly remedy the damage it caused, the Plan Administrator and Ms. Gold failed to act in a prudent and diligent manner for the sole benefit of the Plan participants and beneficiaries.

44. Ms. Goldstein's ex-husband sought guidance from the Court on how to remedy any investment loss attributable to the unauthorized 401(k) liquidation.

45. The Domestic Relations Court entered an Order purportedly allocating the loss equally between the two (2) parties.

46. The Order, however, is not a QDRO; as such, by federal law, the Order cannot be enforced against the Plan.

47. Rather than pass the loss to the Plan participant and beneficiary, the Plan Administrator should have made a corrective contribution to the Plan account to restore the full value of the benefit of both the Participant and Ms. Goldstein.

48. Once the 401(k) account was reinvested and any losses remedied, the Plan

Administrator should have promptly distributed fifty percent (50%) of the marital portion of the 401(k) to Ms. Goldstein.

49. Despite the QDRO being self-executing and Ms. Goldstein's numerous requests for distribution, Ms. Gold refused to calculate the amount owed and disburse the benefits.

50. Indeed, on or around November 13, 2015, Ms. Gold and Ms. Goldstein's prior counsel communicated by telephone.

51. During the call, Ms. Gold stated she had no intention of calculating the amount owed to Ms. Goldstein and stated the amount should be calculated by Ms. Goldstein's ex-husband and WFA.

52. On or around November 12, 2015, the Circuit Court of Cook County entered an Order instructing GMS to proceed with transferring fifty percent (50%) of the marital portion of the 401(k) to Ms. Goldstein as required under the QDRO.

53. A copy of the November 12, 2015 Order was provided to Ms. Gold and WFA.

54. WFA responded via letter clarifying that they prepared the QDRO to divide the 401(k). "That is the only service that [WFA] is able to provide. We cannot make the actual transfer as that is the responsibility of the plan administrator. Only the plan administrator can determine the amount to be transferred to an alternate payee and facilitate the action." A true and correct copy of the November 13, 2015 WFA letter is attached hereto as **Exhibit C**.

55. WFA went on to state:

> Your client completed the distribution form supplied to her by the Plan to request complete distribution. The plan administrator misinterpreted the alternate payee's request and liquidated both her portion of the account and the participant's portion of the account. The error lies not with [Ms. Goldstein's] application for distribution. The distribution form that she completed can only apply to the amount assigned to her in the QDRO.

8

>> The error was made by the plan administrator, as no alternate payee has the right to any monies not specifically awarded in the QDRO.

Ex. C.

56. On or around November 13, 2015, Ms. Goldstein's divorce counsel wrote Ms. Gold to inform her of the Circuit Court's November 12, 2015 Order and demanding distribution of fifty percent (50%) of the marital portion of the 401(k). A true and correct copy of the November 13, 2015 correspondence with Ms. Gold is attached hereto as **Exhibit D**.

57. The letter clarifies that the "Plan Administrator has a fiduciary duty to the Plan and [is] obligated to transfer the funds pursuant to the QDRO." *Id.*

58. The letter also states "attached is a letter from WFA specifically stating that they do not provide the service of calculating the amount transferable to [Ms. Goldstein]. It is plan administrator's obligation to determine this amount with the assistance of Midwest Benefits and/or John Hancock." *Id.*

59. Ms. Gold failed to respond to the November 13, 2015 correspondence.

60. On December 7, 2015, Ms. Goldstein's divorce attorney sent another letter demanding that Mr. Yehuda Bitton, the owner of GMS, contact him immediately to resolve the matter.

61. Indeed, the year ended and GMS did not distribute the lump-sum payment despite the QDRO, the subsequent Court orders, Ms. Goldstein's distribution request six months prior, and numerous other requests.

62. On January 14, 2016, Ms. Goldstein wrote to Ms. Gold to inquire about the distribution and calculation of fifty percent (50%) of the marital portion of the 401(k).

63. Ms. Goldstein wrote:

>> You have had in your possession, complete, error-free QDRO and transfer

>forms since June 17, 2015. Just about SEVEN months. If I do not hear from you by Friday, January 15, 2016, at Noon (CST) regarding the status of this issue, and information regarding a QUALIFIED person to calculate the amount to be transferred, I will be forced to go ahead with a Federal Law Suit. Golan's Moving & Storage is seriously negligent at this time.

A true and correct copy of the January 14, 2016 email is attached hereto as **Exhibit E**.

64. Ms. Gold did not fulfill her duties acting on behalf of the Plan Administrator and as Trustee of the Plan.

65. Ms. Gold failed at even the most basic task—providing Ms. Goldstein with a copy of the Plan's SPD.

66. After numerous requests for a copy of the Plan's SPD, Ms. Gold responded in a January 15, 2016 email to Ms. Goldstein, instructing her to obtain a copy from her ex-husband. A true and correct copy of the January 15, 2016 email is attached hereto as **Exhibit F**.

67. Ms. Gold's response was inappropriate in light of the duties of the Plan Administrator under Section 104(b) of ERISA and insensitive.

68. On or around January 29, 2016, William Nichols ("Mr. Nichols"), of Laner Muchin, LTD, wrote directly to Ms. Gold. A true and correct copy of the January 29, 2016 correspondence is attached hereto as **Exhibit G**.

69. Mr. Nichols' letter sets forth a procedure for calculating Ms. Goldstein's portion of the 401(k)—which became more complicated due to Ms. Gold's delay, unauthorized distribution, and additional delay. *Id*.

70. Mr. Nichols' calculation of Ms. Goldstein's entitlement under the QDRO improperly reduced Ms. Goldstein's benefit by the investment loss (approximately $8,000.00) caused by the Plan Administrator's unauthorized liquidation of the entire 401(k) account on or around September 30, 2015.

71. Ms. Goldstein's ERISA counsel responded to Mr. Nichols, explaining that the reduction was improper, in violation of federal law, and should not be applied to Ms. Goldstein's fifty percent (50%) of the marital portion of the 401(k).

72. Rather than reduce Ms. Goldstein's distribution by the loss caused by the Plan Administrator's mistake, the Plan Administrator should have made a corrective contribution to restore the full balance of the Plan account for the benefit of the Participant and Ms. Goldstein.

73. On or around February 15, 2016, Ms. Goldstein emailed Ms. Gold and requested a statement of the Participant's Plan account (information the Plan Administrator has a statutory duty to produce without need for a request from the alternate payee).

74. Ms. Gold responded "I am not in possession of that information nor am I permitted to submit it to you."

75. When Ms. Gold provided a figure for the fifty percent (50%) marital portion of the 401(k), Ms. Goldstein asked how the figure was calculated.

76. Ms. Gold admitted she did not work with Midwest Benefits and/or John Hancock; rather, she added numbers provided by Ms. Goldstein's ex-husband.

77. Finally, on March 1, 2017, the Plan Administrator transferred funds from the 401(k) to Ms. Goldstein.

78. During nearly nine (9) months of delay—by the Plan Administrator and Ms. Gold—the value of the 401(k) dropped substantially.

79. As of June 30, 2015, Ms. Goldstein's fifty percent (50%) of the marital portion of the 401(k) was $98,698.35.

80. On March 1, 2016, $75,529.18 was transferred into Ms. Goldstein's rollover IRA.

81. The nine (9) month delay reduced Ms. Goldstein's distribution by nearly twenty-

five percent (25%) or $24,169.17.

82. Indeed, she only received thirty-eight percent (38%) rather than fifty percent (50%) of the marital portion of the 401(k) as of the month of her initial request.

83. On March 4, 2016, pursuant to Section 104(b)(4) of ERISA, Ms. Goldstein's counsel requested copies of:

    a. The Plan document with all amendments in effect as of June 12, 2015;

    b. The Plan's SPD—which Ms. Gold previously failed to provide to Ms. Goldstein;

    c. The Plan's summary annual report for the 2014 plan year; and

    d. Account Statements for the Plan account for the last twelve (12) months.

84. In March 2016, Ms. Goldstein via counsel, contacted GMS's counsel to raise several objections to the QDRO distribution and cure the harm caused to Ms. Goldstein.

85. Ms. Goldstein's counsel clarified that Ms. Goldstein's claim is not limited to a claim for benefits; it includes a claim to statutory penalties as well as a claim based on the Plan Administrator's abdication of its fiduciary duties under both the Plan and ERISA.

86. On April 19, 2016, Ms. Goldstein's counsel asked Mr. Nichols to advise if GMS would like to entertain the claim in accordance with the Plan's ERISA procedure.

87. On May 9, 2016, Ms. Goldstein provided the Plan Administrator with notice of her appeal of the denial of her claim to a full and timely distribution of benefits payable to her under the terms of the QDRO.

88. The Plan Administrator failed to respond to the benefit claim within ninety (90) days.

89. On July 14, 2016, Ms. Goldstein's counsel wrote to Mr. Nichols to advise him of the response requirements as provided by ERISA regulations.

90. On July 22, 2016, Ms. Goldstein's counsel advised GMS's counsel that the response (assuming it is adverse) was overdue and asked when the Plan Administrator would respond.

91. On October 14, 2016, Mr. Nichols issued a benefit denial letter on behalf of the Plan Administrator to serve as the Plan Administrator's written notice and explanation of the denial. A true and correct copy of the October 14, 2016 denial letter is attached hereto as **Exhibit H**.

92. Ms. Goldstein appealed the Plan Administrator's October 14, 2016 denial.

93. In connection with the appeal, on November 8, 2016, Ms. Goldstein's counsel requested that the Plan Administrator provide copies of all documents, records, and other relevant information in accordance with the applicable ERISA regulations.

94. Mr. Nichols supplemented the benefit denial letter on December 13, 2016.

95. On January 26, 2017, Ms. Goldstein submitted her appeal of the denial of benefit claim as set forth in the October 14, 2016 letter and supplemented by the Decemb13, 2016 letter. A true and correct copy of the January 26, 2017 appeal letter is attached hereto as **Exhibit I**.

96. The January 26, 2017 appeal sets forth that the Plan Administrator failed to or refused to discharge the following QDRO-related duties:

    a. To act promptly and in compliance with the Plan's QDRO procedures;

    b. To promptly notify the participant and each alternative payee of the receipt of a domestic relations order in compliance with Section 206(d)(3)(G);

    c. To determine whether the domestic relations order is a QDRO within a reasonable time following receipt and to notify the parties of such determination in compliance with Section 206(d)(3)(G);

      d.      To provide alternate payees with notice of the Plan's QDRO procedures "promptly upon receipt by the plan of the domestic relations order;" and

      e.      To separately account for the amount payable to an alternative payee and to pay such segregated amounts including any interest therein to the alternate payee when the QDRO determination is made as required by Section 206(d)(3)(H).

Ex. I at 2.

97. The January 26, 2017 appeal also lists the Plan Administrator's breach of fiduciary duties and its obligation with respect to the QDRO, *e.g.*, Ms. Gold's inexperience caused unnecessary delays, Ms. Gold refused to calculate Ms. Goldstein's fifty percent (50%) share of the marital portion of the 401(k), Ms. Gold's refusal to provide Ms. Goldstein with a SPD, and Ms. Gold's failure to provide Ms. Goldstein with statement of the Participant's account. *Id*.

98. The appeal also rebuts the Plan Administrator's argument that Ms. Goldstein's acceptance of the reduced QDRO distribution constitutes a release of the right to claim all benefits to which she is entitled.

99. Ms. Goldstein's appeal asserts that Ms. Goldstein did not sign a release, the relevant emails do not support a release, any purported release is void for lack of consideration, and the Plan Administrator's duty to Ms. Goldstein has not been discharged because the QDRO payment was not made in accordance with the ERISA statutory requirements.

100. On April 18, 2017, the Plan Administrator issued its Decision on Appeal.

101. The Plan Administrator denied the appeal and noted that "Ms. Goldstein has now exhausted the Plan's administrative claim and appeal procedures and is free to pursue any other remedies available to her."

102. Accordingly, Ms. Goldstein brings her claim before this Honorable Court.

## COUNT I
## Denial of Benefits
## (29 U.S.C. §1132(a)(1)(B))

103. Ms. Goldstein incorporates Paragraphs 1-102 as though fully stated herein.

104. Ms. Goldstein properly made a claim for benefits.

105. Ms. Goldstein exhausted the Plan's administrative appeals process.

106. Pursuant to the QDRO, Ms. Goldstein is entitled to fifty percent (50%) of the marital portion of the 401(k) account to be paid as a lump sum payment to [Ms. Goldstein] as soon as practicable after this Order has been approved as a QDRO.

107. The Court entered the QDRO on June 12, 2015.

108. On or around June 17, 2015, Ms. Goldstein submitted the QDRO and Form to Ms. Gold, as Trustee and the person acting on behalf of the Plan Administrator.

109. On June 30, 2015, the 401(k) aggregate account balance was $201,223.32.

110. This aggregate account balance did not fluctuate significantly during the summer of 2015.

111. As of June 30, 2015, Ms. Goldstein's fifty percent (50%) of the marital portion of the 401(k) was $98,698.35.

112. The Plan Administrator delayed the distribution for almost nine (9) months.

113. On March 1, 2016, $75,529.18 was transferred into Ms. Goldstein's rollover IRA.

114. The nine (9) month delay unlawfully reduced Ms. Goldstein's distribution by nearly twenty-five percent (25%)—$24,169.17.

115. Indeed, she only received thirty-eight (38%) rather than fifty percent (50%) of the marital portion of the 401(k) as of the month of her initial request.

116. The Plan Administrator denied Ms. Goldstein's claim to $24,169.17 and interest.

WHEREFORE Plaintiff, Hildi Goldstein, respectfully requests judgment in her favor and against Golan's Moving & Storage, Inc. as administrator of Golan's Moving & Storage, Inc. 401(k) Profit Sharing Plan on Count I and an award of denied benefits, statutory interest, attorneys' fees, ERISA penalties, and any other relief this Honorable Court deems just and appropriate.

## COUNT II
### Breach of Fiduciary Duty
### (29 U.S.C. §1132(a)(1)(A), (3), (c))

117. Ms. Goldstein incorporates Paragraphs 1-116 as though fully stated herein.

118. GMS, as administrator of Golan's Moving & Storage, Inc. 401(k) Profit Sharing Plan, owes fiduciary duties to Ms. Goldstein as an alternate payee of the Plan.

119. Ms. Gold acts on behalf of the Plan Administrator and serves as Trustee of the Plan; Ms. Gold owes fiduciary duties to Ms. Goldstein as an alternate payee of the Plan.

120. Ms. Gold and the Plan Administrator breached their fiduciary duties.

121. For example, Ms. Gold acting on behalf of the Plan Administrator and serving as Trustee of the Plan:

    a. Failed to act solely in the interest of Plan participants and beneficiaries;

    b. Failed to implement the QDRO in a prudent and timely manner;

    c. Failed to separately account for amounts payable to Ms. Goldstein and segregate those amounts including interest as soon as the QDRO was approved;

    d. Failed to distribute Ms. Goldstein's portion of the 401(k) as soon as practicable after approval of the QDRO;

    e. Required Ms. Goldstein to complete superfluous forms even though the QDRO is self-executing;

    f. Erroneously liquidated the entire 401(k) account without authorization;

      g.    Failed to make a corrective contribution to the 401(k) to remedy the loss caused by the unauthorized liquidation;

      h.    Attempted to pass the loss caused by the Plan Administrator's erroneous liquidation to participants and beneficiaries;

      i.    Failed to timely provide copies of the SPD;

      j.    Refused to perform the duties of a Plan Administrator;

      k.    Delayed nearly nine (9) months to transfer Ms. Goldstein's portion of the 401(k);

      l.    Denied Ms. Goldstein's claim for benefits; and

      m.    Failed to conduct itself according to the standard of conduct required of a Plan Administrator.

122. On June 30, 2015, the 401(k) aggregate account balance was $201,223.32.

123. This aggregate account balance did not fluctuate significantly during the summer of 2015.

124. As of June 30, 2015, Ms. Goldstein's fifty percent (50%) of the marital portion of the 401(k) was $98,698.35.

125. Ms. Gold and the Plan Administrator unlawfully delayed the distribution for almost nine (9) months.

126. On March 1, 2016, $75,529.18 was transferred into Ms. Goldstein's rollover IRA.

127. The nine (9) month delay reduced Ms. Goldstein's distribution by nearly twenty-five percent (25%)—$24,169.17.

128. Indeed, she only received thirty-eight (38%) rather than fifty percent (50%) of the marital portion of the 401(k) as of the month of her initial request.

129. The Plan Administrator denied Ms. Goldstein's claim to $24,169.17 and interest.

WHEREFORE Plaintiff, Hildi Goldstein, respectfully requests judgment in her favor and

against Julie Gold and Golan's Moving & Storage, Inc. as administrator of Golan's Moving & Storage, Inc. 401(k) Profit Sharing Plan and award of denied benefits, statutory interest, attorneys' fees, ERISA penalties, and any other relief this Honorable Court deems just and appropriate.

## COUNT III
### Administrator's Refusal to Supply Requested Information
### (29 U.S.C. §1132(a)(1)(A), (c))

130. Ms. Goldstein incorporates Paragraphs 1-129 as though fully stated herein.

131. Ms. Goldstein made numerous requests to the Plan Administrator and Ms. Gold for ERISA-mandated plan information, including the SPD.

132. On or around January 15, 2016, Ms. Gold responded to Ms. Goldstein's requests via email.

133. Ms. Gold instructed Ms. Goldstein to obtain a copy from her ex-husband.

134. On or around February 15, 2016, Ms. Goldstein requested a statement of the Participant's Plan account.

135. Ms. Gold responded that she was not in possession of it or permitted to submit it to Ms. Goldstein.

136. Neither Ms. Gold nor the Plan Administrator provided Ms. Goldstein with the requested information.

137. Having not received a copy of the SPD, on March 4, 2016, Ms. Goldstein's counsel made requests for the information.

138. The Plan Administrator acted intentionally and in bad faith when it refused to provide Ms. Goldstein's requests and directed her to obtain copies of the SPD from her ex-husband.

WHEREFORE Plaintiff, Hildi Goldstein, respectfully requests judgment in her favor and against Golan's Moving & Storage, Inc. as administrator of Golan's Moving & Storage, Inc. 401(k) Profit Sharing Plan and award of ERISA penalties of $110.00 per day of delinquency, attorneys' fees, costs, and any other relief this Honorable Court deems just and appropriate.

Dated: October 19, 2017

Respectfully submitted,

HILDI GOLDSTEIN,
Plaintiff,

By: /s/ *Peter M. Katsaros*
     One of Her Attorneys

Peter M. Katsaros, Esq. (ARCD# 3122661)
Gillian G. Lindsay, Esq. (ARDC# 6298511)
GOLAN CHRISTIE TAGLIA LLP
70 W. Madison Street, Suite 1500
Chicago, Illinois 60602
(312) 263-2300
pmkatsaros@gct.law
gglindsay@gct.law